| | |
|---|---|
| **DISTRICT COURT, BOULDER COUNTY, COLORADO**<br>1777 6th Street<br>Boulder, Colorado 80302 | |
| **Plaintiff:** Stephen D. Black, an individual and Colorado resident,<br><br>**v.**<br><br>**Defendant:** Sprouts Farmers Market, Inc., fka Sprouts Farmers Market, LLC, a Delaware corporation. | ▲COURT USE ONLY▲ |
| Giovanni M. Ruscitti, Atty. Reg. # 23375<br>BERG HILL GREENLEAF & RUSCITTI LLP<br>1712 Pearl Street<br>Boulder, CO 80302<br>Tel:   (303) 402-1600<br>Fax:   (303) 402-1601<br>gmr@bhgrlaw.com<br>*Attorneys for Plaintiff, Stephen D. Black* | Case Number:<br><br>Div.:          Ctrm.: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Stephen D. Black (**"Mr. Black"**), through his undersigned counsel, Berg Hill Greenleaf & Ruscitti LLP, hereby respectfully submits the following Complaint and Jury Demand against Defendant Sprouts Farmers Market, Inc. fka Sprouts Farmers Market, LLC (**"Sprouts"** or **"Defendant"**), and states as follows:

## PARTIES

1.      Plaintiff Stephen D. Black is an individual residing in the State of Colorado.

2.      Defendant is a Delaware corporation, with its principal place of business located at 11811 N. Tatum Blvd. #2400, Phoenix, AZ 85028.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over the subject matter of this dispute pursuant to Colorado Constitution Article 6, Section 9.

4.      Defendant is subject to personal jurisdiction in this Court pursuant to C.R.S. § 13-1-124.

5.      The amount in dispute is more than $15,000.00.

6.      Defendant operates several grocery store locations in Boulder County. Accordingly, venue is properly before this Court in accordance with C.R.C.P. 98(c).

## FACTUAL BACKGROUND

7.      Sprouts operates a chain of grocery stores in at least 12 states (10 states as of December 29, 2014). According to its Form 10-K filed with the United States Securities and Exchange Commission (the "**SEC**") on February 26, 2015 for the period ending December 28, 2014 (the "**2014 10-K Report**"):

> Sprouts Farmers Market operates as a healthy grocery store that offers fresh, natural and organic food that includes fresh produce, bulk foods, vitamins and supplements, grocery, meat and seafood, bakery, dairy, frozen foods, body care and natural household items catering to consumers' growing interest in eating and living healthier. Since our founding in 2002, we have grown rapidly, significantly increasing our sales, store count and profitability. With 198 stores in 12 states as of February 26, 2015, we are one of the largest specialty retailers of fresh, natural and organic food in the United States.

> The cornerstones of our business are fresh, natural and organic products at compelling prices (which we refer to as "Healthy Living for Less"), an attractive and differentiated shopping experience, and knowledgeable team members who we believe provide best-in-class customer service and product education.

*See* **2014 10-K Report** at page 1.[1]

8.      In describing its business model, Sprouts published that: (a) its stores were in "a convenient, small-box format (average store size of 28,000 to 30,000 sq. ft.)…"; (b) it "choose[s] not to carry most of the traditional, national branded consumer packaged goods generally found

---

[1] Because of its size, the 2014 10-K Report is not attached hereto, but is publically available.

at conventional grocery retailers (e.g., Doritos, Tide and Lucky Charms)…"; and (c) it is a "a

value leader in fresh produce…." *Id.* at pages 1-2.

9.    In describing its typical customer, Sprouts reports:

> We believe the majority of our customers are initially attracted to our
> stores by our fresh produce, which we offer at prices we believe are
> significantly below those of conventional food retailers and even further
> below high-end natural and organic food retailers. We drive customer
> traffic by aggressively promoting produce and other items through weekly
> advertisements designed primarily to reach the everyday supermarket
> shopper. These customers are typically "trial" customers that limit their
> shopping to specific products or departments, such as produce. Through
> department-specific promotions, in-store signage, and customer education,
> these trial customers become "transition" customers that shop new
> departments and try new products. Over time, through customer service
> and engagement, targeted marketing, and increased knowledge of our
> product offering, we believe that transition customers become "lifestyle"
> customers that shop with greater frequency throughout the entire store.

*Id.* at page 10. In describing how its model is different from the "conventional model,"

Sprouts published the following in its May 2015 Investor Deck, which was attached to its

Form 8-K that was filed with the SEC and dated May 11, 2015:[2]

---

[2] Because of its size, the referenced Form 8-K is not attached hereto, but is publically available.



10.     According to the 2014 10-K Report, Sprouts had 191 stores open in 10 states as of

December 29, 2014. *Id.* at pages 3-4. Those 10 states (with the number of stores in each) were:

California (79), Nevada, (5) Utah (4), Colorado (25), Arizona (27), New Mexico (6), Texas (33),

Kansas (2), Oklahoma (6), and Georgia (4). *Id.* at page 4.

11.     According the 2014 10-K Report, Sprouts identified its competitors as follows:

> The $620 billion U.S. supermarket industry is large, intensely competitive
> and highly fragmented. We compete for customers with a wide array of
> food retailers, including natural and organic, specialty, conventional, mass
> and discount and other food retail formats. Our competitors include
> conventional supermarkets such as ***Kroger and Safeway, as well as other
> food retailers such as Whole Foods, Natural Grocers by Vitamin Cottage
> and Trader Joe's.***

*Id.* at page 13 (emphasis added).   Lucky's Market Parent Company, LLC ("**Lucky's Market**"), a

small Colorado based natural and organic grocer, was not listed by Sprouts as a competitor.

12.     Similarly, in its Proxy Statement for 2015 Annual Meeting of Stockholders, filed

with the SEC March 19, 2015 (the "**2015 Proxy**"), Sprouts reported that it benchmarked its

executive compensation "against a peer group of companies with which we may compete for

executive talent," using a

> peer group [that] is periodically evaluated and updated to ensure the
> companies in the group remain relevant. The compensation committee
> approved the following criteria for our peer group beginning in 2014: (i)
> companies within the grocery retail sector, including specialty and
> conventional retailers; (ii) companies in the natural and organic food
> distribution sector, (iii) companies considered high-growth retail
> companies, (iv) companies with revenue between $1.5 billion and $6.5
> billion (approximately 0.5x to 2.5x our trailing 12 months revenue), with
> the exception of Whole Foods Market, Inc., which had 2013 revenue of
> $12.9 billion but was determined by our compensation committee and its
> consultant to be a direct specialty retail peer; or (v) companies with a
> market capitalization between $200 million and $6 billion, again with the
> exception of Whole Foods Market, Inc."

*See* 2015 Proxy at pages 28-29.[3]  The companies listed for 2014 were:

---

[3] Because of its size, the 2015 Proxy is not attached hereto, but is publically available.

The peer group of the 15 companies which, along with broader survey data, were used for benchmarking purposes in fiscal 2014 is set forth below (in millions).

| Company | Most Recent FYE Revenue | Market Value as of Most Recent FYE |
|---|---|---|
| Whole Foods Market, Inc. | $14,194 | $13,767 |
| United Natural Foods, Inc. | $6,794 | $2,911 |
| Dicks Sporting Goods, Inc. (1) | $6,213 | $5,297 |
| Harris Teeter (1) | $4,710 | $2,433 |
| Roundy's, Inc. (1) | $3,950 | $461 |
| Ingles Markets, Inc. | $3,836 | $320 |
| Urban Outfitters, Inc. | $3,087 | $5,277 |
| Weis Markets, Inc. | $2,693 | $1,414 |
| GNC Holdings, Inc. | $2,613 | $4,173 |
| SpartanNash, Inc. (1) | $2,597 | $932 |
| The WhiteWave Foods Co.(1) | $2,542 | $3,978 |
| hhgregg, Inc. | $2,339 | $283 |
| Village Super Market | $1,519 | $228 |
| Fresh Market, Inc. | $1,512 | $1,692 |
| Natural Grocer by Vitamin Cottage | $521 | $366 |
| 75th Percentile | $4,710 | $4,173 |
| Median | $2,693 | $1,692 |
| 25th Percentile | $2,339 | $366 |
| Sprouts Farmers Market | $2,967 | $4,970 |

*Id.* at page 29. Again, Lucky's Market was not listed a company "within the grocery retail sector, including specialty and conventional retailers" or as a company within "the natural and organic food distribution sector" for purposes of benchmarking its "executive compensation against a peer group of companies with which we may compete for executive talent." *Id.* at pages 28-29.

13.    Likewise, in its March 2015 Investor Deck, which was attached to its Form 8-K dated as of March 3, 2015, [4] and in its May 2015 Investor Deck, Sprouts identified companies such as Whole Foods, Wal-Mart, Trader Joes, Costco, Frys Marketplace and Target as competitors when studying its growth in Phoenix, Arizona.

---

[4] Because of its size, the referenced Form 8-K is not attached hereto, but is publically available.

14.     Thus, it is clear from its publically filed documents that Sprouts does not consider Lucky's Market to be a direct and material competitor, and only considers very large grocers such as Whole Foods, Kroger, Safeway, Natural Grocers by Vitamin Cottage, Wal-Mart, Trader Joes, Costco, Frys Marketplace, Harris Teeter, Weis Markets, and Target to be direct and material competitors.

15.     With respect to future growth, Sprouts published it was "pursuing a number of strategies designed to continue our growth, including expansion of our store base, driving comparable store sales growth, enhancing our operating margins and growing the Sprouts brand. We intend to continue expanding our store base by pursuing new store openings in our existing markets, expanding into adjacent markets and penetrating new markets." 2014 10-K Report at page 41.

16.     According to the 2014 10-K Report, "[a]s of December 28, 2014, we [Sprouts] had more than 17,000 team members." *Id.* at page 16.

17.     According to the 2014 10-K Report, Sprouts' revenue for the period ending December 28, 2014 was $2,967,424,000. *Id.* at page 39.

18.     Mr. Black was employed by Sprouts as its Chief Information & Marketing Officer from November 9, 2009 to December 29, 2014, the day after the period covered by the 2014 10-K Report.

A.     **The Plan Documents and Grants.**

19.     In connection with Mr. Black's employment with Sprouts, Sprouts granted Mr. Black stock options pursuant to two separate option plans, the 2011 Option Plan (the "**2011 Option Plan**") and the 2013 Incentive Plan (the "**2013 Incentive Plan**," together with the 2011

Option Plan, the "**Plans**"). The 2011 Option Plan is attached hereto as <u>Exhibit A</u> and the 2013

Incentive Plan is attached hereto as <u>Exhibit B</u>.[5]

20.     The 2011 Plan provided that it was to be governed by Delaware law and that all

claims relating to the plan should be litigated in New York.

21.     Importantly, however, and except with respect to outstanding options granted

under the 2011 Option Plan, the 2013 Incentive Plan **replaced** the 2011 Option Plan. *See* Form

S-1, filed with the SEC on May 9, 2013 at page 139 ("We have adopted the 2013 Incentive Plan

to replace our 2011 Option Plan....");[6] *see also* Form S-1, filed with SEC on November 7, 2013

at page 85 ("Our board of directors has adopted, and our equity holders have approved, the 2013

Incentive Plan. The 2013 Incentive Plan became effective on July 31, 2013 and replaced the

2011 Option Plan (except with respect to outstanding options under the 2011 Option Plan).").[7]

22.     Like the 2011 Plan, the 2013 Incentive Plan provides that it is governed by

Delaware law.  However, unlike the 2011 Plan it replaced, the 2013 Incentive Plan does not

contain a venue provision for disputes, reflecting Sprouts' intent to keep Delaware law as the

controlling law, but removing New York as the venue for disputes.

    **i.     The 2011 Option Plan and 2012 Grant**

23.     Specifically, on July 23, 2012, Sprouts granted Mr. Black "time" and

"performance" options (defined herein separately as the "**Time Options**" and the "**Performance**

**Options**") to purchase certain Class B units of Sprouts stock in accordance with the terms of the

---

[5] The 2011 Option Plan was filed with the SEC on May 9, 2013, and the 2013 Incentive Plan was filed with the SEC on July 22, 2013.

[6] Because of its size, the Form S-1 is not attached hereto, but is publically available.

[7] Because of its size, the Form S-1 is not attached hereto, but is publically available.

2011 Option Plan (the "**2012 Grant**"). The 2012 Grant is not attached hereto. However, a form copy of an award grant was filed with the SEC on May 9, 2013.

24. According to the 2012 Grant, the Performance Options will vest in three equal annual installments at the end of each of the Company's 2012, 2013 and 2014 fiscal years.

25. Importantly, the 2012 Grant and the 2011 Option Plan do not require Mr. Black to be employed by Sprouts at the time those calculations are made; instead, they only required him to be employed at the end of the calendar year in order for the Performance Options to vest, which was the intent of the parties. The 2012 Grant further provides that the Time Options will vest in 12 equal or nearly equal installments at the end of each calendar quarter, starting with the calendar quarter.

26. Section 5 of the 2011 Option Plan states that options granted under the 2012 Grant may terminate upon:

(a)	the 91st day following the date the Grantee ceases to be an Employee for any reason; provided, however, that (i) in all cases the portion of any Option that did not vest prior to or upon the date of termination of employment or engagement with the Company or its Affiliates for any reason shall terminate immediately upon such termination, and (ii) if such termination is for Cause, the vested portion shall terminate as well;

(b)	the seventh anniversary of the date of grant as set forth in the Grant Letter; and

(c)	cancellation, termination or expiration of the Options pursuant to action taken by the Administrator in accordance with Section 8.

*See* Exhibit A at Section 5, page 6.

27.     In addition, the 2011 Option Plan granted Sprouts the right to repurchase any or all of the Class B units issued to Mr. Black, and provided that the purchase price shall be the Fair Market Value, as defined by the 2011 Option Plan. *Id.* at Section 9, page 7.

28.     However, the 2011 Option Plan provided that if, among other reasons, Mr. Black engages in "Specified Conduct" as defined therein, the price per share to be paid shall not exceed the price paid for the Class B units by Mr. Black, less any dividends or distributions previously paid.

29.     The 2011 Option Plan defines Specified Conduct, in pertinent part, as follows:

> "Specified Conduct" means ... if the Grantee is not party to an employment agreement that contains post-termination restrictive covenants, a Grantee's ... (ii) engaging, directly or indirectly, as an employee, partner, consultant, director, stockholder (other than as a passive investor in not more than 5% of the shares of any publicly traded class of securities of any business), owner, or agent in any business that is ***directly and materially competitive with the businesses conducted by [Sprouts] at the time of the termination of Grantee's employment.***

*Id.* at Section 2(u), page 4 (emphasis added). Because Mr. Black terminated his employment with Sprouts on December 29, 2014, December 29, 2014 is referred to herein as the **"Measurement Date"** for purposes of determining whether a company is "directly and materially competitive" with Sprouts.

**ii.     The 2013 Incentive Plan and the 2013 Grant**

30.     In 2013, Sprouts adopted the 2013 Incentive Plan to replace the 2011 Option Plan (except that Mr. Black's options granted under the 2011 Option Plan survived). On July 31, 2013, Sprouts granted Mr. Black stock options under the 2013 Incentive Plan (the **"2013 Grant"**). The 2013 Grant is attached hereto as Exhibit C.

31.     The 2013 Grant provides as follows with respect to vesting:

> One-half of the Option will vest in twelve equal or nearly equal installments at the end of each calendar quarter, starting with the calendar quarter that ends on September 30, 2013 [sic]

> One-half of the Option will vest in three equal or nearly equal installments at the end of the Company's 2013, 2014 and 2015 fiscal years, provided that as of the end of such fiscal year, both the Company's Comparable Store Sales and the Company's EBITDA (each as defined in Exhibit A) for the applicable fiscal year equal or exceed the following targets....

*See* Exhibit C at page 1.

32. As part of the 2013 Incentive Plan, the parties entered into a Stock Option Agreement (the "**2013 SOA**"), attached hereto as <u>Exhibit D</u>, which provided as follows with respect to termination of options thereunder:

> Should your employment with the Company terminate for any reason, the portion of your Option that is not then vested will immediately terminate, and the portion that is then vested will terminate at the times set forth below. Your Option will expire in any event at the close of business at the Company's registered office on the seventh anniversary of the Option Grant Date, as shown on the cover sheet.

*See* Exhibit D at "Termination", page 3.

33. In addition, the 2013 SOA provides that if Mr. Black is terminated for Cause (as that term is defined therein) or he engages in "Specified Conduct" (again, as that term is defined therein), all options will terminate immediately.

34. The 2013 SOA defines Specified Conduct as follows:

> "Specified Conduct" means ... if you are not party to an employment agreement that contains post-termination restrictive covenants, your ... (ii) engaging, directly or indirectly, as an employee, partner, consultant, director, stockholder (other than as a passive investor in not more than 5% of the shares of any publicly traded class of securities of any business), owner, or agent in any business that is *directly and materially competitive with the businesses conducted by the Company and its Affiliates at the time of termination of your employment.*

11

*Id.* at Ex. D, page 8 (emphasis added). This definition is, for all relevant purposes, identical to the definition of "Specified Conduct" in the 2011 Option Plan. By including the phrase words "directly" and "materially" in the conjunctive fashion in both Plans, it is clear from the plain language of both Plans that Sprouts was not including just any competitor in the definition – it included only those competitors that were both "directly" and "materially" competitive, such as those listed in its 2014 10-K Report, 2015 Proxy, and the Investor Decks.

**B.    The Vested Options as of December 31, 2014.**

35.    As of December 29, 2014, Mr. Black had received 22,917 vested options under the 2012 Grant with a strike price of $3.78 per share, and 5,500 vested options pursuant to the 2013 Grant at a strike price of $18.00 per share (the "**Vested Options**").

**C.    Mr. Black's Resignation and Mr. Sanders' Statement that "They [Lucky's] aren't in our space."**

36.    On December 29, 2014, Mr. Black advised Sprouts' CEO, Doug Sanders, of his decision to resign, and also told Mr. Sanders that he was joining Lucky's Market Parent Company, LLC (defined above as "Lucky's Market"), a small Colorado-based natural and organic grocer.

37.    Mr. Sanders wished him luck and told Mr. Black that "they [Lucky's] aren't in our [Sprouts'] space."

38.    Mr. Sanders' statement is supported by Sprouts' admissions in its 2014 10-K Report, the 2015 Proxy, and the above-referenced Form 8-Ks, as well as the differences between the two companies as of the Measurement Date:

| CATEGORY/ITEM | SPROUTS | LUCKY'S |
|---|---|---|
| *Number of Stores* | 191 | 7 |
| *Sales* | $2,967,424,000 | $83,000,000 |
| *Number of Employees* | 17,000 | 871 |
| *Number of States where stores were located* | 10 | 5 |

39.     In addition, as of the Measurement Date, only three (3) of Sprouts' 191 stores, or a mere 1.57%, were located in the same cities (two in Boulder, Colorado and one in Longmont, Colorado) where Lucky's Markets stores were located.  And, the two companies competed in only one state (Colorado), a mere 10% of the states where Sprouts conducts business.  On the other hand, according to its 2014 10-K Report, "[a]s of December 28, 2014, we [Sprouts] operated 79 stores in California, making California our largest market representing 41% of our total stores and 44% of our net sales in the fiscal year ended December 28, 2014." *See* 2014 10-K Report, at page 25.

40.     In addition to being completely different in size and revenue, and not directly or materially competing in a substantial majority of cities with Sprouts locations, the companies also employed different growth strategies, had numerous operational differences, focused on and attracted different demographics, occupied different segments within the natural and organics grocery store channels, and were at completely different stages of their business lives. Specifically, as of the Measurement Date:

a.     As stated in its 2014 10-K Report, Sprouts' growth strategy focused on "existing markets, expanding into adjacent markets and penetrating new markets." On the other hand, still in start-up mode, Lucky's Market focused on key real estate deals in towns where there is little or no competition in the natural organic channel.

b.     As stated in its 2014 10-K Report, the typical Sprouts store is 28,000-30,000 square feet in size, while Lucky's Markets customizes each store depending on the location and market needs - Lucky's stores vary in size from 14,000 to 40,000 square feet.

c.     A significant part of Lucky's Market's business model is its culinary department. On the other hand, Sprouts does not have a culinary department and does not place any emphasis on this part of its business.

d.     According to its 2014 10-K report, Sprouts focuses on fresh produce, which is designed to be a focal point of each store.

e.     Sprouts' current customer demographic is the 35 – 50 year old female who is (i) focused on eating healthier and/or bringing healthy eating habits into her family environment, and/or (ii) focused on dietary restrictions, and/or (iii) may be converted from being a conventional shopper. Lucky's Market, on the other hand, employs a "we are not going to judge you" approach, mixing in conventional products such as Pepsi, Campbell's Soup, and its culinary department with natural and organic products (which, according to Sprouts' 2014 10-K report, Sprouts intentionally omits from its product inventory).

f.     Sprouts has been in business since 2002 and has achieved nationwide success, growing the core company to over 50 stores, and then merging with

14

Henry's and Sunflower Farmers Market.  It then went public in 2013, and, according to its 2014 10-K report, will open over 20 stores in 2015.  Lucky's Market, on the other hand, is still considered a start-up, opening its second store 18 months ago and experiencing limited growth since then.

**D.**   **Sprouts' Breach of Contract.**

41.    After his resignation, and consistent with the Plan documents, Mr. Black's Vested Options remained in his E*Trade account, leading Mr. Black to reasonably believe that they remained in place and available to exercise.  *See* Exhibit E.  This belief was consistent with, and supported by, representations made to him by Sprouts' attorneys regarding when and how the vested options are terminated under the Plans.   Tellingly, and consistent with the Plan documents, Mr. Black's unvested options no longer appeared in his E*Trade account after his resignation.

42.    On March 1, 2015, Mr. Black e-mailed Mr. Derek Mirza, a Sprouts in-house attorney, noting that the Vested Options were expiring on March 31, 2015 and inquiring into when and how Mr. Black could exercise the Vested Options.

43.    On March 2, 2015, Mr. Mirza replied, asserting that Mr. Black had "accepted an employment position with a company that directly competes" with Sprouts, and that therefore, the Vested Options had all terminated upon the termination of Mr. Black's employment with Sprouts.

44.    Sprouts' position on Mr. Black's options was confirmed by Brandon Lombardi, Sprouts' Chief Legal Officer, in an e-mail dated March 3, 2015.

45.    In subsequent correspondence from its counsel, Sprouts took the position that because Lucky's and Sprouts were in competition in Boulder and Longmont, Colorado, this

constituted "direct" and "material" competition, resulting in forfeiture of the Vested Options (even though Mr. Sanders told Mr. Black that Lucky's Market was not "in [Sprouts'] space and Lucky's Market was not listed as a competitor in Sprouts' 2015 Proxy or its 2014 10-K Report). In addition, Sprouts took the position that because Mr. Black was not employed by Sprouts at the time its Compensation Committee made the determination that the performance criteria for the Performance Options and options granted under the 2013 Incentive Plan had been met, the options did not vest, even through: (a) the options appeared in Mr. Black's E*Trade account in January 2015 as "vested" (*See* Exhibit E) and stayed there as such until he tried to exercise them in March of 2015 (*See* Exhibit F), unlike the "unvested" options, which disappeared from his account upon his resignation; (b) the performance criteria for the Performance Options and options granted under the 2013 Incentive Plan had been met; and (c) the Plan documents do not require that Mr. Black remain employed on the date the calculation is made, but require only that he remain employed at the end of the calendar year at issue.  Finally, Sprouts took the position that even if Mr. Black had any vested options that he could exercise, it could repurchase any such options by simply tendering back to him the amount he paid for such options (i.e., a zero sum).  Mr. Black disagrees with each of these positions.

46.     On March 18, 2015, and again on March 20, 2015, Mr. Black attempted to exercise his Vested Options, only to find that Sprouts had wrongfully removed them from his E*Trade account, thereby breaching the Plans and committing conversion and civil theft.  (*See* Exhibit G.)

### FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

47.     Mr. Black repeats, realleges, and reiterates paragraphs 1 through 46 above as though fully set forth at length herein.

16

48.     A bona fide, justiciable, and substantial controversy exists between the parties with respect to the terms and conditions of the Plans, which are binding contracts between the parties.   Specifically, Sprouts contends that by going to work for Lucky's Market, Mr. Black forfeited his Vested Options because Lucky's Market and Sprouts were in competition in Boulder and Longmont, Colorado, which constituted "direct" and "material" competition. Sprouts further contends that the measurement date of "directly and materially competitive" is something different than the language in the Plans, which states that it should be measured "at the time of termination of [Mr. Black's] employment."   In addition, Sprouts contends that because Mr. Black was not employed by Sprouts at the time its Compensation Committee made the determination that the performance criteria for the Performance Options and options granted under the 2013 Incentive Plan had been met, the options did not vest.  Finally, contends that even if Mr. Black had any vested options that he could exercise, it could repurchase any such options by simply tendering back to him the amount he paid for such options (i.e., a zero sum).   Mr. Black disagrees with each of these positions.

49.     Therefore, bona fide, justiciable, and substantial controversies exist with respect to:

a.     the interpretation and application of the phrase "directly and materially competitive with the businesses conducted by [Sprouts]" "at the time of termination of [Mr. Black's] employment";

b.     how and when the determination of whether two companies were "directly and materially competitive" is made;

c.     the interpretation and application of the vesting provisions in the Plans;

d.     whether, by going to work for Lucky's Market, Mr. Black is "directly and materially" competing "with the businesses conducted by [Sprouts]" measured as of the "time of the termination of [Mr. Black's] employment," even though (i) only three (3) of Sprouts' 191 stores, or a mere 1.57%, were located in the same cities where Lucky's Market stores are located; (ii) the two companies competed in only one state (Colorado), a mere 10% of the states where Sprouts conducts business; and (iii) Lucky's Market was not listed as a competitor in Sprouts' 2015 Proxy or its 2014 10-K Report;

e.     whether Sprouts can assert that, because he went to work for Lucky's Market, Mr. Black's Vested Options have terminated and/or Sprouts has the right to repurchase any options exercised by Mr. Black by simply tendering back to him his purchase price; and

f.     whether Sprouts can assert that because Mr. Black was not employed by Sprouts at the time its Compensation Committee made the determination that the performance criteria for the Performance Options and options granted under the 2013 Incentive Plan had been met, the options did not vest, even through: (i) the options appeared in Mr. Black's E*Trade account in January 2015 as "vested" and stayed there as such until he tried to exercise them in March of 2015 (unlike the "unvested" options, which disappeared from his account upon his resignation); (ii) the performance criteria for the Performance Options and options granted under the 2013 Incentive Plan had been met; and (iii) the Plan documents do not require that Mr. Black remain employed on the date the calculation is made, they only require that he remain employed at the end of the calendar year at issue.

18

50.     The parties have adverse legal interests with respect to their present and/or prospective obligations the Plans, as Sprouts seeks to claw back the value of the Vested Options, while Mr. Black has demonstrated that the Vested Options remained in effect and exercisable after the termination of his employment with Sprouts.

51.     A judgment would serve a useful purpose in clarifying or settling the legal issues, as a declaratory judgment of the kind sought will determine the parties' rights and obligations pursuant to the Plans.

52.     A judgment would finalize the controversy and offer relief from uncertainty as it would spell out the parties' rights and obligations and obviate the need for further litigation between the parties.

53.     Without a judicial determination as to the status of the Vested Options, it is difficult to attempt to settle any of the claims made against Sprouts.

54.     By reason of the foregoing, and pursuant to Delaware law and  C.R.S. § 13-51-105 and C.R.C.P. 57, Mr. Black is entitled to a declaratory judgment that: (a) Lucky's Markets and Sprouts were not direct and material competitors as of December 29, 2014, and that therefore, the Vested Options remained in effect and exercisable after the termination of Mr. Black's employment with Sprouts; and (b) Mr. Black had received 22,917 vested options under the 2012 Grant with a strike price of $3.78 per share, and 5,500 vested options pursuant to the 2013 Grant at a strike price of $18.00 per share.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

55.     Mr. Black repeats, realleges, and reiterates paragraphs 1 through 54 above as though fully set forth at length herein.

56.     The Plans, 2012 Grant and 2013 Grant are binding contracts between the parties.

57.    Mr. Black has performed all of his obligations pursuant to the Plans, 2012 Grant and 2013 Grant which were necessary for the Vested Options to become fully vested and exercisable.

58.    Sprouts has breached the terms of the Plans, 2012 Grant and 2013 Grant by preventing Mr. Black from timely exercising the Vested Options and receiving the financial benefit of these transactions.

59.    Based on the foregoing, Mr. Black has been and will be damaged in an amount to be determined at trial.

**WHEREFORE**, Mr. Black respectfully demands judgment as follows:

(a)    on the First Cause of action, a declaration that Lucky's is not a direct and material competitor of Sprouts, and therefore, that the Vested Options remained in effect and exercisable after the termination of Mr. Black's employment with Sprouts, pursuant to the terms of the Plans;

(b)    on the Second Cause of action, damages in an amount to be proven at trial;

(c)    such other and further relief as this Court may deem just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

*Nothing contained herein or in any prior communication is intended to waive any rights, claims or defenses allowed by law, and all such rights, claims, and defenses are hereby expressly reserved.*

Respectfully submitted this 29th day of May, 2015.

BERG HILL GREENLEAF & RUSCITTI LLP

*[Pursuant to Rule 121, the signed original is on file at Berg Hill Greenleaf & Ruscitti LLP]*

*s / Giovanni M. Ruscitti*

Giovanni M. Ruscitti, Esq.
1712 Pearl Street
Boulder, Colorado 80302
*Attorneys for Plaintiff*

Plaintiff's Address:
11981 Spruce Canyon Circle
Golden, CO 80403